**PFIZER INC., Plaintiff,**

v.

**PERRIGO COMPANY and L. Perrigo Company, Defendants.**

No. 95 Civ. 5072(DC).

United States District Court, S.D. New York.

Dec. 19, 1997.

Carella, Byrne, Baine, Gilfillan, Cecchi, Stewart & Olstein by John G. Gilfillan III, Roseland, NJ, Price, Heneveld, Cooper, DeWitt & Litton by Randall G. Litton, James A. Mitchell, Harold W. Reick, Barry C. Kane, Grand Rapids, MI, Serchuck & Zelermyer by Wesley Chen, New York City, for defendants.

## OPINION

CHIN, District Judge.

After a three-week trial in this case, the jury returned a verdict in favor of plaintiff Pfizer Inc. ("Pfizer") on its claim that defendants Perrigo Company and L. Perrigo Company (together, "Perrigo") infringed its patent no. 5,338,538 (the " '538 Patent") under the "doctrine of equivalents." The jury awarded Pfizer compensatory damages in the amount of $1,500,000. The jury also returned a verdict in favor of Perrigo finding that Pfizer had failed to prove either "literal infringement" of the '538 Patent or infringement of the trade dress of Pfizer's Advanced Formula PLAX® product.

Certain claims were reserved for decision by the Court following the jury's verdict. These are Perrigo's claims that the '538 Patent is invalid and unenforceable and Pfizer's request for permanent injunctive relief with respect to both patent and trade dress infringement.

For the reasons that follow, Perrigo's defenses of invalidity and unenforceability are rejected. Pfizer's request for permanent injunctive relief is granted as to its patent infringement claim but denied as to its trade dress infringement claim. Pursuant to Fed. R.Civ.P. 52, the following constitute my findings of fact and conclusions of law on the non-jury issues.

## THE FACTS

### A. *The Parties*

Pfizer manufactures and sells national brand non-prescription personal care products, including Advanced Formula PLAX®, a pre-brushing dental rinse that loosens plaque on teeth. Pfizer engages in extensive re-

Hopgood, Calimafde, Kalil & Judlowe by Stephen B. Judlowe, William G. Todd, Porter F. Fleming, Eve Kunen, Jason A. Lief, Scott J. Bornstein, New York City and Paul H. Ginsburg, Grover F. Fuller, Jr., Arthur A. Silverstein, Pfizer Inc., New York City, for plaintiff.

search to develop and improve its products, and it supports its products—including PLAX®—with substantial advertising.

Perrigo produces and sells private label personal care products, including its own version of a plaque-loosening pre-brushing dental rinse, called "Anti–Plaque." Perrigo's products are sold to supermarket and drug store chains as well as independent stores and pharmacies under private labels. These private labels sometimes bear the name of the store or chain (*e.g.*, Revco, Food Lion, Price Chopper) and sometimes they bear a house brand name (*e.g.*, Equate, Good Sense).

Perrigo does not engage in "primary research" to develop new products, but instead "focuse[s] on developing store brand products equivalent in formulation, quality and efficacy to existing national brand products." (PX 204, at 8). Likewise, Perrigo does not engage in any substantial advertisement of its products.

## B. *PLAX® and Anti–Plaque*

### 1. *Original PLAX®*

PLAX® was created by Pfizer's predecessor-in-interest, Oral Research Laboratories ("ORL"), in the mid–1980's. The original PLAX® was sold in a clear bottle with a white top, with a label that was clear except for horizontal white lettering and a horizontal blue strip across the middle. Soon thereafter, Perrigo came out with its Anti–Plaque product, sold in trade dress similar to Pfizer's PLAX® trade dress: a similarly shaped clear bottle with a white top, with a label that was clear except for horizontal white lettering and some horizontal blue lettering across the middle. (*See* PX 56, 57). Moreover, the formula for Perrigo's product was a copy of the formula for original PLAX®, and the two products were sold in an identical red color.

In 1988, Pfizer sued Perrigo for patent and trade dress infringement in the United States District Court for the District of New

Jersey. A motion for a preliminary injunction was granted enjoining Perrigo from using 14 of its Anti–Plaque labels, as Judge Bissell found a likelihood of confusion; the motion was denied as to 8 labels.

The New Jersey case was settled in 1991, with Perrigo admitting that it had infringed ORL's patents. (PX 41). Although the parties agreed that a certain bottle was "acceptable" and could be used by Perrigo (which is the bottle Perrigo is still using), Perrigo also agreed to make a "substantial modification" to its container "so that Perrigo's product no longer creates the same overall commercial impression as ORL's PLAX, and is immediately distinguishable from PLAX by consumers." (*Id.*).

### 2. *The New Trade Dress for Original PLAX®*

Thereafter, Pfizer wanted "to create a package for PLAX that would better distinguish it from the private label products made specifically . . . by Perrigo." (Tr. at 98). This effort started in 1992. Although Pfizer was exploring a re-formulation of PLAX® at the time, Pfizer decided to change its trade dress without waiting for the reformulation process to be completed, because it wanted to "clearly distinguish" its product from the "private label knock-offs." (Tr. at 100).

A new trade dress was created and Pfizer started shipping original PLAX® in the new trade dress in 1992 and early 1993. (*See id.*). The new trade dress included a new logo with a distinctive blue and white vertical box on the left side of the bottle. (*See* PX 56).

### 3. *Advanced Formula PLAX®*

In January 1994, after extensive research and development,[1] Pfizer introduced Advanced Formula PLAX®, which contained a new ingredient—tetrasodium pyrophosphate—that was believed to increase the effectiveness of the product. The final composition of Advanced Formula PLAX® was "completely different" from the composition

---

1. Catherine Gray, one of the inventors, worked on the advanced formula project 60–85% of her time for some 18–20 months. In addition, others had been working on the project already when she joined the oral care products group in January 1990. Gray performed hundreds of experiments in a "very long process" that involved much "trial and error." (Tr. at 273, 282–84, 406).

of Original PLAX®. (Tr. at 281). In developing the new composition, Pfizer's inventors sought to create a product with improved "organoleptic properties"—smell, appearance, and taste. Flavor and alcohol content were increased for "impact." (Tr. at 281, 286–87). Improved efficacy was also a major factor.

By June of 1990, Pfizer researchers were exploring the use of tetrasodium pyrophosphate; the Pfizer inventors believed that the addition of tetrasodium pyrophosphate, a "detergent booster," would help make sodium lauryl sulfate, a "detergent," work more effectively. (Tr. at 288, 295, 306–07). One difficulty they encountered was that at cold temperatures (near freezing), the product would crystallize or "flocculate"—solid matters would precipitate out of the solution. Eventually, after hundreds of hours of additional research, a solution to the problem was uncovered and a new formula—the Advanced Formula—was developed.

Advanced Formula PLAX® was marketed in a trade dress similar to the trade dress introduced in 1992, but there were some changes, including the addition of the words "ADVANCED FORMULA" in blue letters in a horizontal yellow box. (PX 8). The vertical blue and white vertical box remained, although some "stippling" was added to one end of the box. Pfizer spent in excess of $100,000 in connection with the re-design of its trade dress. (Tr. at 108–09).

To publicize the newly-adopted trade dress and to give notice that it intended to protect its trade dress, Pfizer ran an advertisement stating:

Our New Logo Looks Different ... Pfizer intends to fully protect its new Plax package design.

(PX 65; *see* Tr. at 107–08).

### 4. *Perrigo's Anti–Plaque Product*

Within weeks after the release of Advanced Formula PLAX®, Perrigo started the process of copying Pfizer's formula and emulating its trade dress. Perrigo prepared three "New Product Profiles," each dated February 24, 1994, one for each of Pfizer's three versions of Advanced Formula PLAX®: regular, mint, and peppermint.

Attached to each profile was a copy of the trade dress for Advanced Formula PLAX®. The profiles contain the following comments:

NB [national brand] version is first new product introduction in several years.... New introduction should help pump some life into the NB and boost promotion/advertising activity by them....

Changes reflect an enhanced formulation which should prove to be more appealing to customers and consumers....

Alcohol level is up from 7.2% to 8.5%. Tetrasodium Pyrophosphate has been added. Other ingredient changes involved, too. Patent(s) may be involved.

By January 1995, Perrigo started marketing its Advanced Formula Anti–Plaque dental rinse. (Tr. at 104–05). Advanced Formula Anti–Plaque was distributed in approximately 169 labels. Many of these labels were not challenged by Pfizer as infringing its trade dress. Some 77 labels, however, were challenged. These contested labels were divided into four groups at trial: Group A consisted of 29 labels featuring a vertical "Anti–Plaque" box on the left side in a blue and white scheme; most have some stippling or a fade motif in the box; most feature the words Advanced Formula; all have store names; none say "Compare to Plax." Group B consisted of a single label, Perrigo's house label; the label contains no store name and does say "Compare to Plax." Group C consisted of 41 labels featuring a vertical, blue box (on the left side for 39 labels and on the right side for 2 labels) containing the word "Anti–Plaque"; most have the words "Advanced Formula" and all say "Compare to PLAX." Finally, Group D consisted of 7 labels with "Anti–Plaque" featured horizontally.

Revco, one of Perrigo's customers, specifically asked Perrigo to use graphics that "compare[d] closely to NBE inlook [sic] and colors." (PX 225). "NBE" refers to the national brand equivalent—here, Pfizer's Advanced Formula PLAX®. The Revco label (PX 223) does compare closely to Pfizer's Advanced Formula PLAX® label both in look and colors.

## C. *The '538 Patent*

Pfizer obtained a patent for the new formula—the '538 Patent, which issued on August 16, 1994. The application for the '538 Patent, as well as two predecessor applications, were reviewed by Primary Examiner Shep K. Rose.

The '538 formula provided for "at least about 0.3% by weight" tetrasodium pyrophosphate. Perrigo's product initially contained approximately .197% rounded up to .2%, tetrasodium pyrophosphate. In January 1996, Perrigo commenced the manufacture and distribution of a reformulated product that contained only .03% by weight of a pyrophosphate ion concentration.

## DISCUSSION

### A. *Perrigo's Defenses of Invalidity and Unenforceability*

In contending that the '538 Patent is invalid and unenforceable, Perrigo makes seven separate arguments. The first four arguments are based on the concept of obviousness: Perrigo contends that the alleged innovations introduced by the '538 Patent were not entitled to patent protection because they were "obvious." 35 U.S.C. § 103. The fifth and sixth arguments are asserted under 35 U.S.C. § 112: Perrigo contends that the claims in the '538 Patent are invalid because they are broader than the subject matter that the inventors regarded as their invention and that the specifications of the '538 Patent do not enable one of ordinary skill in the art to practice the invention claimed. Finally, in its seventh argument, Perrigo alleges that, because Pfizer violated its duty of candor in prosecuting its application, the '538 Patent is unenforceable.

### 1. *Obviousness*

■ The '538 Patent is presumed valid. *See* 35 U.S.C. § 282; *Custom Accessories, Inc. v. Jeffrey–Allan Indus., Inc.,* 807 F.2d 955, 961 (Fed.Cir.1986). Perrigo thus has the burden of proving invalidity by clear and convincing evidence. *Id.*

■ Section 103 of the Patent Act provides that a patent may not be obtained if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

In determining "obviousness," a court is to consider such factors as:

(1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed subject matter and the prior art; and (4) the objective evidence of nonobviousness.

*Heidelberger Druckmaschinen AG v. Hantscho Commercial Prods., Inc.,* 21 F.3d 1068, 1071 (Fed.Cir.1994). "Objective"—or secondary—evidence of nonobviousness includes evidence of copying, commercial success, failure of others, and a long felt but unresolved need for the product. *Id.* 87 F.3d at 1567 (citing *Dennison Mfg. Co. v. Panduit Corp.,* 475 U.S. 809, 810–11, 106 S.Ct. 1578, 1578–79, 89 L.Ed.2d 817 (1986)). Historical facts and circumstances also may shed light on the question of whether the subject matter of the invention would have been obvious.

■ With these considerations in mind, I hold that Perrigo has not demonstrated by clear and convincing evidence that the '538 Patent is invalid for obviousness.

### (a) *The Scope and Content of the Prior Art*

Perrigo's obviousness argument is based on six items of prior art that it contends were material and analogous but were not brought to the attention of the Patent Office: (i) original formula PLAX®, (ii) the Colgate mouth rinse, (iii) the Procter & Gamble Prebrushing Rinse, (iv) the Nabi Patent, (v) the Gaffar Patent, and (vi) the Van Wazer publication. Perrigo's reliance on this prior art is misplaced.

### (i) *Original Formula PLAX®*

The original formula PLAX® was covered by the Goldemberg Patents, which were before Shep K. Rose, the Examiner who evaluated the '538 Patent. (PX 1). The Goldemberg Patents disclosed a pre-brushing dental rinse that used sodium lauryl sulfate, but

they did not teach the use of any pyrophosphate. Nor did they mention low temperature stability or flocculation. As Catherine Gray, one of the inventors of Advanced Formula PLAX®, testified, the new formula was "completely different from the old formula." (Tr. at 344).

#### (ii) The Colgate Rinse

The Colgate mouth rinse (DX 1356) apparently was not before the Examiner. The Colgate product was sold for a brief period in 1987. Although it did make use of tetrasodium pyrophosphate, it did not include sodium lauryl sulfate or anything that would serve as a substitute therefor. (Tr. at 1695–96). There is nothing in the record concerning this product's capacity to remain free from cold temperature precipitation or flocculation.

#### (iii) The Procter & Gamble Prebrushing Rinse

The Procter & Gamble Prebrushing Rinse was covered by the Parran Patent, which was before the Examiner. (PX 1). The Procter & Gamble product was marketed briefly in 1989 as "Crest BrushMate" or as "Crest LiquaFloss" or as "BrushMate." The Parran Patent did involve the use of pyrophosphate salts, but in the context of providing an "anticalculus benefit," as opposed to an antiplaque benefit. The Parran Patent called for a composition with a pH of from about 6.0 to about 10.0. There is no discussion in the Parran Patent of low temperature stability problems or low temperature precipitation or flocculation.

#### (iv) The Nabi Patent

Although the Nabi Patent was not listed in the '538 Patent, Rose also was the Examiner for the Nabi Patent. Moreover, the Nabi Patent was classified in multiple classes searched during examination of the '538 Patent, and reference was made to the Nabi Patent in the materials before Examiner Rose when he examined the '538 Patent. (PX 311). Hence, he is presumed to have had the Nabi Patent in mind when he considered the '538 Patent. See Polaroid Corp. v. Eastman Kodak Co., 641 F.Supp. 828, 833 (D.Mass.1985) ("[P]rior art described in the specifications is expected to be considered by the Examiner .... Patent examiners are also presumed to be aware of patents which issued from applications they had earlier examined."), aff'd, 789 F.2d 1556 (Fed.Cir. 1986). Moreover, I find, as a factual matter, that Examiner Rose, an experienced examiner who was assigned many patent applications for oral health care products, had access to the Nabi Patent. (Tr. at 1875–92).

The Nabi Patent covered an antibacterial, antiplaque oral composition that could be substantially liquid in character, such as a mouthwash, or substantially pasty in character, such as a toothpaste. The oral composition used tricolosan as an antibacterial antiplaque agent. In liquid form it has a pH "generally in the range of about 4.5 to about 9 or 10 and most preferably about 6.5 to 7.5." (Nabi Patent, col. 7, lines 13–15). There is no disclosure in the Nabi Patent of any cold temperature impediment to stability or the problem of low temperature precipitation or flocculation.

#### (v) The Gaffar Patent

Rose also examined the Gaffar Patent, which was classified in multiple classes searched during examination of the '538 Patent, and reference was made to the Gaffar Patent in the materials before Rose when he examined the '538 Patent. (DX 1047). Hence, he is presumed to have had the Gaffar Patent in mind at the time he considered the '538 Patent. Moreover, I find, as a factual matter, that Examiner Rose had access to the Nabi Patent. (Tr. at 1875–92).

The Gaffar Patent covered an antibacterial, antiplaque, anticalculus oral composition such as a "dentrifice, mouthwash, lozenge or chewing gum." It teaches that the oral composition should be "free from or substantially free from tetrasodium pyrophosphate or a combination of tetrapotassium pyrophosphate and tetrasodium pyrophosphate." (Gaffar Patent, col. 3, lines 45–48).

#### (vi) The Van Wazer Publication

The Van Wazer publication (DX 1063) apparently was not before the Examiner. The portion of the Van Wazer book cited by Perrigo, however, does not relate to any kind of dental rinse or oral health care product; rather, it merely describes the utility of tet-

rasodium pyrophosphate in detergent and soap products used for industrial and household cleaning.

### (b) *The Level of Ordinary Skill in the Art*

As the parties apparently agree, in this case a person having ordinary skill in the art would have an undergraduate degree in chemistry or biology with several years of experience.

### (c) *The Differences Between the Claimed Subject Matter and the Prior Art*

There are substantial differences between the prior art and the claimed invention. None of the prior art references disclosed a pre-brushing dental rinse that included both sodium lauryl sulfate and tetrasodium pyrophosphate. None of the prior references addressed the problem of low temperature instability or low temperature precipitation or flocculation and thus none of the prior references proposed a solution for such a problem. In contrast, these are matters specifically addressed by the '538 Patent. Claim 1 of the '538 Patent teaches:

> A stable, liquid oral prebrushing composition for loosening and removing plaque present on dental surfaces which composition is free from flocculation or crystal formation after storing for seven days at about 35° F. or redissolves any flocculation or crystal formation at about 35° F. on increasing the temperature of the composition to room temperature comprising a detergent builder selected from the group consisting of a dialkali metal pyrophosphate salt, a tetraalkali metal pyrophosphate salt and a mixture thereof providing at least about 0.3% by weight $P_2O_7$ $-4$, and about 0.08 to about 2.0% by weight of sodium lauryl sulfate based on the weight of the prebrushing composition having a pH of about 7.2 to about 7.9.

Key features thus included stability, after storing for seven days at about 35° F., as well as the use of a combination of tetrasodium pyrophosphate and sodium lauryl sulfate, with a relatively narrow pH range of 7.2 to 7.9. None of the prior art references disclosed these features in this combination. Nor do I accept Perrigo's contention that it would have been obvious, at the time the invention was made, to substitute a pyrophosphate detergent builder such as tetrasodium pyrophosphate for the sodium borate-sodium bicarbonate builder combination used in the original formula PLAX® or to substitute sodium lauryl sulfate as a surfactant for the surfactants used in the Colgate rinse and the Procter & Gamble prebrushing rinse.

### (d) *Objective Evidence of Nonobviousness*

Consideration of secondary or objective indicia of nonobviousness also leads to the conclusion that Perrigo has not met its burden of proving invalidity of the '538 Patent. Most significantly, Perrigo copied Advanced Formula PLAX® from Pfizer. That Perrigo resorted to copying the patented formula is strong evidence that the improvements introduced by Advanced Formula PLAX® were not obvious from the prior art references. Had they been obvious, Perrigo presumably would not have needed to resort to copying. *See, e.g., Heidelberger,* 21 F.3d at 1072.

Advanced Formula PLAX® was also a commercial success, as it achieved hundreds of millions of dollars in sales. This financial success strongly suggests that Pfizer had created a new product. *See Demaco Corp. v. F. Von Langsdorff Licensing, Ltd.,* 851 F.2d 1387, 1391 (Fed.Cir.), *cert. denied,* 488 U.S. 956, 109 S.Ct. 395, 102 L.Ed.2d 383 (1988).

Finally, other companies had tried but failed to develop a comparable product. Both Colgate and Procter & Gamble, two of the world's largest health care products companies, recognized the existence of a market for prebrushing dental rinses. Although both companies tried, neither was able to develop a successful product. If the improvements to Advanced Formula PLAX® were so obvious, one would have expected Colgate or Procter & Gamble to have had more success. *See Symbol Techs. Inc. v. Opticon, Inc.,* 935 F.2d 1569, 1578–79 (Fed. Cir.1991).

These factors, taken as a whole, demonstrate that a person skilled in the art would

not have viewed Pfizer's invention as obvious at the time it was made. Therefore, Perrigo has failed to overcome the presumption of validity on the grounds of obviousness.[2] Hence, the first four grounds asserted for invalidity are rejected.

### 2. Section 112

Perrigo's fifth and sixth grounds for invalidity are based on 35 U.S.C. § 112, which sets forth certain specificity requirements for patent applications. The fifth argument relies on the second paragraph of section 112, which covers indefiniteness, and the sixth argument relies on the first paragraph of section 112, which covers enablement.

#### (a) Indefiniteness

The second paragraph of section 112 provides:

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as the invention.

■ To determine whether a patent claim is indefinite, i.e., whether it fails to "particularly point[] out and distinctly claim[] the subject matter," a court must consider "whether one skilled in the art would understand the bounds of the claim when read in light of the specification.... If the claims read in light of the specification reasonably apprise those skilled in the art of the scope of the invention, [section] 112 demands no more." *Credle v. Bond*, 25 F.3d 1566, 1576 (Fed.Cir.1994) (quoting *Miles Lab., Inc. v. Shandon Inc.*, 997 F.2d 870, 875 (Fed.Cir. 1993), *cert. denied*, 510 U.S. 1100, 114 S.Ct. 943, 127 L.Ed.2d 232 (1994)).

■ I am not persuaded that Perrigo has met its burden of proving, by clear and convincing evidence, that the '538 Patent is invalid for indefiniteness. Perrigo contends that certain formulas covered by the '538 Patent are stable even though their pH range is outside the range of 7.2 and 7.9 claimed in the '538 Patent. But there are at least two reasons why Perrigo's argument fails. First, this argument is not really an indefiniteness argument, for the argument is not that the '538 Patent is indefinite, but rather that the specification is too definite— that the claimed pH range of 7.2 to 7.9 could, or should, have been broader. Second, even if Perrigo is correct that the pH range could be broader than that claimed, all that means is that the inventors claimed less than their invention permitted.

The indefiniteness argument is therefore rejected.

#### (b) Enablement

The first paragraph of section 112 provides that:

> the specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

The purpose of this paragraph is to assure that the inventor provides enough information in the patent "to enable" a person skilled in the art to make and use the invention "without undue experimentation, relying on the patent specification and the knowledge of the art." *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1571 (Fed. Cir.1991).

---

**2.** As is apparent from my decision to reject the obviousness defense, I have not accepted the opinions of Dr. Gershon and Mr. Van Horn to the effect that the invention claimed in the '538 Patent would have been obvious. (Tr. at 1650, 1840). Not only did Dr. Gershon acknowledge that he was "no ... patent expert," he failed to consider objective factors such as commercial success. His testimony in general was not convincing. (*See, e.g.,* Tr. at 1645, 1713).

Likewise, I was not persuaded by Mr. Van Horn's testimony. Although he acknowledged that objective factors must be considered, he conceded that he did not take the "long felt need" factor into account in his analysis of obviousness. (Tr. at 1913–18). He testified that he did take "commercial success" into account, but he did so only after commercial success had been the subject of Dr. Gershon's cross-examination the day before. (Tr. at 1953–54). And his evasiveness in response to questions on "copying" as an indication of nonobviousness was most telling. (Tr. at 1945–47).

■ Perrigo contends that the '538 Patent was not enabling because it teaches that disodium pyrophosphate was one of the preferred pyrophosphate salts even though the inventors had purportedly eliminated it from the formula. (Def. Invalidity Br. at 23) (citing PX 115). By including the reference to disodium pyrophosphate in the patent, Perrigo contends, the inventors misled persons skilled in the art.

Perrigo's argument is rejected as without factual basis. The notes of Catherine Gray relied on by Perrigo were made on November 14, 1991 (PX 115), almost two years before the filing of the '538 Patent application. Those notes themselves suggest that the problem was not inherently with the use of disodium pyrophosphate, but with the particular batches of disodium pyrophosphate: some had more insolubles than others. (PX 115, at 004564). Hence, the inventors had not eliminated disodium pyrophosphate from the formula. Ms. Gray testified at trial that it was "not correct" that "disodium pyrophosphate would not give you a stable product." (Tr. at 373). Rather, she testified that disodium pyrophosphate "can be used." (Tr. at 376). I accept her testimony in this respect. Consequently, the enablement argument is rejected as well.

### 3. Inequitable Conduct

■ Finally, Perrigo argues that the '538 Patent is unenforceable because Pfizer purportedly engaged in intentional misconduct and bad faith in prosecuting the '538 Patent by misleading the Examiner. To prevail on this claim, Perrigo must show by clear and convincing evidence that Pfizer and its representatives either failed to disclose material information or submitted false material information in the prosecution of the '538 Patent with the intent to deceive. *See Heidelberger,* 21 F.3d at 1073.

I have carefully considered Perrigo's allegations in this respect as well as the evidence presented at trial. I find that Pfizer did not intentionally withhold material information, that it did not intentionally submit any material false information, and that it did not at any time act with the intent to deceive. The

allegations of bad faith and misconduct on the part of Pfizer are meritless.

In sum, Perrigo's defenses of invalidity and unenforceability are rejected. The jury's finding that Perrigo infringed the '538 Patent under the "doctrine of equivalents" and its award of $1,500,000 in compensatory damages to Pfizer will stand.

### B. Pfizer's Request for Permanent Injunctive Relief

Pfizer seeks permanent injunctive relief both on its patent claims and its trade dress claims.

### 1. Patent Infringement

Injunctive relief is usually granted when there has been a finding of patent infringement. *See W.L. Gore & Assocs., Inc. v. Garlock, Inc.,* 842 F.2d 1275, 1281 (Fed.Cir. 1988). This is so because "[t]he heart of [the patentee's] legal monopoly is the right to ... prevent others from utilizing his discovery." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 135, 89 S.Ct. 1562, 1583, 23 L.Ed.2d 129 (1969).

■ Here, Perrigo's only opposition to a permanent injunction for against future patent infringement is essentially a mootness argument: it contends that in January 1996 it reformulated its product to reduce the amount of pyrophosphate ion concentration to .03% by weight (as opposed to the original approximately .2%). The argument is rejected, for the mere fact that Perrigo reduced the amount of pyrophosphate is not a sufficient basis for denying an injunction against future infringement. *W.L. Gore & Assoc.,* 842 F.2d at 1282. An injunction is particularly appropriate in this case because this is the second time that a finding or admission has been made that Perrigo violated a patent covering the product in question. (PX 41).

Accordingly, Pfizer's request for a permanent injunction prohibiting future infringement of the '538 Patent is granted.

### 2. Trade Dress Infringement
### (a) The Jury's Verdict

Before resolving the trade dress claim for injunctive relief on the merits, I must resolve

a threshold issue raised by Perrigo: whether the jury's verdict in favor of Perrigo on the trade dress claims precludes Pfizer from obtaining injunctive relief on those claims now. I conclude that it does not.

Where a party asserts both legal and equitable claims that have common issues of fact, and a jury trial has been properly demanded, the parties are entitled to have the legal claims tried to the jury. *Wade v. Orange County Sheriff's Office,* 844 F.2d 951, 954 (2d Cir.1988). In trying the equitable claims after a jury has decided the legal claims, a court may not "reject the jury's determination of facts *essential* to both the legal and equitable claims." *Guzman v. Bevona,* 90 F.3d 641, 647 (2d Cir.1996) (emphasis added). In addition, where a jury renders what amounts to a "general verdict," the evidence is to be construed and the reasonable inferences drawn in favor of the prevailing party, *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 278–79 (2d Cir. 1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980), at least with respect to facts "essential" to the jury's verdict. *Cf. Owens v. Treder,* 873 F.2d 604, 609–10 (2d Cir.1989) (in civil rights case where plaintiff alleged that he was beaten into confessing involuntarily, jury's general verdict convicting him of robbery and felony murder in underlying criminal case did not preclude him from litigating the voluntariness of his confession in civil case, where a finding of involuntariness was "not essential" to the jury's verdict); *see also Song v. Ives Labs., Inc.,* 957 F.2d 1041, 1048 (2d Cir.1992) ("It is clear that a judge sitting at equity may not render a verdict which is inconsistent with that of a jury sitting at law on a claim involving the same *essential* elements.") (emphasis added).

Here, the jury rendered what amounted to a general verdict. To recover damages for trade dress infringement, Pfizer was required to prove two elements: (1) protectible rights in its trade dress and (2) actual confusion or, as a proxy for actual confusion, intentional deception. (Tr. at 2363). The jury, however, was not presented with specific questions as to each element. Rather, the jury was simply asked whether "Pfizer has proven by a preponderance of the evidence that Perrigo infringed the trade dress of the Advanced Formula PLAX® product?" The jury answered the question "No" as to each of the four groups of trade dress in question. It is not clear, then, whether the jury found against Pfizer on the first element (protectible trade dress) or on the second element (actual confusion) or on both elements.

Perrigo argues that, because the jury rendered what amounts to a general verdict, the jury must be presumed to have resolved "all the underlying factual disputes" in Perrigo's favor, including any disputes as to the first element. (Def.Opp.Mem. at 3–4). Consequently, Perrigo argues that in considering Pfizer's trade dress claim for equitable relief, I am bound by the jury's implicit finding that Pfizer did not prove the first element.

I disagree, for a finding that Pfizer's trade dress was not protectible was not essential to the jury's verdict. Rather, I believe that the jury ruled against Pfizer on the second element, actual confusion. The evidence of actual confusion—including Pfizer's survey evidence—was weak. On the other hand, Pfizer's evidence that its trade dress was protectible was strong.

Moreover, even though the jury undoubtedly found against Pfizer on the issue of actual confusion, Pfizer is not required to prove actual confusion to obtain equitable relief. Rather, to obtain injunctive relief, Pfizer need only prove likelihood of confusion. *See PPX Enters., Inc. v. Audiofidelity Enters., Inc.,* 818 F.2d 266, 271 (2d Cir.1987) (discussing the lower standard of proof required for injunctive relief as opposed to money damages); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 875 (2d Cir.1986) ("actual confusion is very difficult to prove and the [Lanham] Act requires only a likelihood of confusions"); *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.,* 932 F.2d 1113, 1122 n. 9 (5th Cir.1991) (actual confusion not required to find likelihood of confusion), *aff'd,* 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). The issue of likelihood of confusion was not put to the jury but was specifically reserved for the Court. (*See* Tr.

at 1900–01). The jury was charged only that it had to find actual confusion to find in favor of Pfizer on the trade dress claim. (Tr. at 2368–70).

Accordingly, under these circumstances, the jury's verdict is no bar to my consideration of Pfizer's application for injunctive relief on the trade dress claim.

### (b) *The Merits*

A district court has power under the Lanham Act to grant permanent injunctive relief to prevent future violations. 15 U.S.C. § 1116(a). As noted, to obtain injunctive relief, Pfizer must prove by a preponderance of the evidence (1) protectible rights in its trade dress and (2) likelihood of confusion.

### (i) *Protectible Trade Dress*

■ A trade dress is protectible if it is inherently distinctive or has acquired secondary meaning. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992). I find that Pfizer's trade dress is inherently distinctive and has acquired secondary meaning.

■ The overall look of the Pfizer Advanced Formula PLAX® trade dress is distinctive. With an "almost unlimited" range of choices in design, Pfizer chose a design that combined a vertical logo, stippling, small colored blocks, a blue, yellow and white color scheme, and a clear rectangular flask-like bottle with a white cap. *See Paddington Corp. v. Attiki Importers & Distrib., Inc.*, 996 F.2d 577, 583 (2d Cir.1993) ("[s]ince the choices that a producer has for packaging its products are … almost unlimited, typically a trade dress will be arbitrary or fanciful and thus inherently distinctive"). Pfizer's design is arbitrary and fanciful.

Perrigo argues that Pfizer's trade dress is not inherently distinctive because it is generic or functional. While one or more elements of Pfizer's trade dress may be generic or functional, such as the use of a bottle or the color red for the cinnamon flavor, the trade dress as a whole is arbitrary and fanciful. *See Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1042 (2d Cir. 1992); *LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 76 (2d Cir.1985). Indeed, that Perrigo itself has used many other types of labels that are not in issue in this case (*see, e.g.,* PX 56, 57) shows that a manufacturer has many options and that Pfizer's overall design is not generic or functional.

■ In addition, Pfizer's trade dress has acquired secondary meaning. Pfizer's vertical-logo trade dress has been used since 1992 and both original PLAX® and Advanced Formula PLAX® have been widely advertised. Pfizer spent in excess of $100,000 on the re-design of the trade dress, and it also embarked on an advertising campaign that highlighted the new trade dress and emphasized that Pfizer was seeking to "clearly distinguish" its product from the "private label knock-offs." (Tr. at 100). Sales have been highly successful, as millions of bottles have been sold. *See Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1222–24 (2d Cir .1987). The consuming public has come to recognize the Advanced Formula PLAX® trade dress as indicating that the product comes from a single source.

Moreover, Perrigo sought to mimic Pfizer's trade dress. Within weeks after Advanced Formula PLAX® was released, Perrigo started the process of copying the formulation and trade dress. Perrigo's "New Product Profiles," dated February 24, 1994, expressly noted the changes to the new "national brand" product and incorporated a copy of the new Advanced Formula PLAX® trade dress. One Perrigo customer specifically asked Perrigo to use graphics that "compare[d] closely to NBE [national brand equivalent] inlook [sic] and colors." (PX 225). Perrigo responded by emulating Pfizer's trade dress, and using a similar design and color scheme. Pfizer used the words "Advanced Formula" on its label; Perrigo did the same. This effort to mimic Advanced Formula PLAX® is strong evidence of secondary meaning, for if the trade dress had not acquired secondary meaning, there would have been little reason for Perrigo to plagiarize it. *Centaur Communications*, 830 F.2d at 1224; *LeSportsac, Inc.*, 754 F.2d at 78.

Accordingly, I find that Pfizer's Advanced Formula PLAX® trade dress is protectible.

### (ii) *Likelihood of Confusion*

 Likelihood of confusion exists when "an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Centaur Communications,* 830 F.2d at 1225 (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 47 (2d Cir.1978) (per curiam), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979)). Likelihood of confusion is usually evaluated by consideration of the factors identified by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). Those factors, as applied to a trade dress case, are: (1) the strength of the plaintiff's trade dress; (2) the degree of similarity between the two competing trade dresses; (3) the proximity of the products in the market place; (4) the likelihood the senior user will bridge the gap between the two products; (5) evidence of actual confusion; (6) the junior user's good faith in adopting the trade dress; (7) the quality of the junior user's product; and (8) the sophistication of the relevant consumer group. *See id.* at 495. I review these factors now.

### (1) *Strength of Trade Dress*

The first factor slightly favors Pfizer. The Advanced Formula PLAX® trade dress is fanciful and arbitrary and has acquired secondary meaning. It was introduced by a substantial advertising campaign directed at consumers, retailers, and professionals. Many millions of bottles of the product have been sold in the trade dress in question.

On the other hand, some aspects of the Pfizer trade dress are generic and functional. The bottles and colors, for example, are largely functional. Nor is there anything exceptional about the choice of a blue, white, and yellow color scheme or horizontal and vertical boxes containing words. On balance, however, I conclude that this factor slightly favors Pfizer.

### (2) *Degree of Similarity*

The second factor slightly favors Perrigo. Although the Perrigo trade dress is similar to the Advanced Formula PLAX® trade dress in many respects, there are some significant differences. The most notable feature of the Pfizer label is the PLAX® name, which appears in large, distinctive, blue letters against a white and blue grid background. It is the PLAX® mark that catches the eye, and there is little doubt when one is buying the Pfizer product that one is buying PLAX®.

On the other hand, the Perrigo product does not use the mark PLAX®. Instead, in most instances, it uses the word "Anti-Plaque" and prominently features the private brand logo—the name of the store or chain or the private label used by a store or chain.[3] Without the PLAX® mark, the Perrigo labels are much less distinct. There is little doubt from the trade dress that the Perrigo product is a generic or private label product.

In addition, the labels in Group C urge the consumer to "Compare to PLAX®." This admonition would surely help reduce or eliminate any potential confusion as to whether the product was a Pfizer product. *See American Home Prods. v. Barr Labs.,* 656 F.Supp. 1058, 1069 (D.N.J.) ("Perrigo's signs essentially beg consumers to distinguish [its] generic ibuprofen tablets from Advil."), *aff'd,* 834 F.2d 368 (3d Cir.1987); *Warner Lambert Co.,* 718 F.Supp. at 398–99 ("prominent use of 'compare and save' signs on shelves ... further distinguish[] the two products from each other in the minds of prospective consumers").

Finally, the Perrigo trade dress does use some different features. On most of its Group A and C labels, Perrigo uses white or yellow lettering for "Anti-Plaque" against a primarily blue background, while the Pfizer label uses blue lettering for PLAX® against a

---

**3.** The use of a private label logo does not, however, preclude a finding of likelihood of confusion. *See Metro Kane Imports, Ltd. v. Federated Dep't Stores Inc.,* 625 F.Supp. 313, 318 (S.D.N.Y.1985), *aff'd without op.,* 800 F.2d 1128 (2d Cir.1986).

Moreover, Perrigo knew from the prior New Jersey litigation that the use of a private label logo did not preclude a finding of infringement if the overall appearance was infringing. (PX 480; Tr. at 1281–82).

primarily white background. The Pfizer label uses a blue and white grid; the Perrigo label does not. A few of the Perrigo labels use stippling in the vertical box, but most do not. The labels in group D in particular are substantially different in design and lay-out from the Pfizer trade dress. They do not use a vertical word logo. Instead, the words on the label are written horizontally.

### (3) *Proximity of Products*

The third factor favors Pfizer in the traditional sense, as the Pfizer and Perrigo products compete directly against each other. In other respects, however, this factor weighs in favor of Perrigo. The evidence showed that the Perrigo and Pfizer products were usually sold side by side. Hence, a consumer shopping for a dental rinse would see the two products next to each other; it is unlikely that the consumer would be confused into believing that he or she was buying one product when she actually was buying the other. *See Conopco, Inc. v. May Dep't Stores Co.*, 46 F.3d 1556, 1563–64 (Fed.Cir. 1994) (where "national brand is being sold side-by-side with the private label brand, the assumption [that a national brand manufacturer would be the source of the competing private label brand product] is at best counter-intuitive"), *cert. denied*, 514 U.S. 1078, 115 S.Ct. 1724, 131 L.Ed.2d 582 (1995). Indeed, Pfizer's own expert conceded that the differences between two products become more apparent when they are sold side by side. (Tr. at 872–73).

### (4) *Bridging the Gap*

The fourth factor favors Pfizer as the gap is already bridged: the products are directly competitive.

### (5) *Actual Confusion*

The fifth factor strongly favors Perrigo, as the jury found that Pfizer had failed to prove actual confusion.

Although the Perrigo Advanced Formula Anti–Plaque dental rinse and Advanced Formula PLAX® had been in the market together for some 20 months at the time of trial, Pfizer presented no direct evidence of actual confusion. Instead, it offered the Jacoby survey, which the jury clearly rejected, for good reason, as the survey was flawed. In one group of 101 people, for example, 16 were judged by Professor Jacoby, on the basis of their answers, to be "definitely confused" for trade dress reasons as between Pfizer's Advanced Formula PLAX® and Perrigo's Advanced Formula Anti–Plaque dental rinse in a Revco bottle. But 13 of the 16 were located in cities that did not have Revco drugstores. Hence, many—if not all—of the 13 probably were not familiar with the Revco name. These results therefore are inconclusive. (Tr. at 873–78).

Given the millions of bottles of both products sold during the 20–month period, the absence of any credible evidence of actual confusion strongly suggests that there is no reasonable likelihood of confusion. *Life Indus. Corp. v. Star Brite Distributing, Inc.*, 31 F.3d 42, 47 (2d Cir.1994) ("Life failed to present any evidence of actual confusion. Although such evidence is difficult to obtain and is not a prerequisite to finding likelihood of confusion, its absence nevertheless weighs against that finding.").

### (6) *Good Faith*

The sixth factor is the most difficult to apply in this case. In the end, however, I conclude that Perrigo did not act in bad faith. Hence, I find that, on balance, this factor favors Perrigo.

There is little doubt that Perrigo engaged in some copying. Its business is to mimic national brand products, to offer consumers—at a substantially lower price—what its contends is the equivalent of national brand products. Clearly, there is a market for generic or private label products, as many consumers are content to forego the more expensive national brand products in favor of the less expensive private label brands. *Warner Lambert Co. v. McCrory's Corp.*, 718 F.Supp. 389, 398–99 (D.N.J.1989) (shoppers in retail store chains have "likely been exposed to generic or discount house brands before"). Perrigo targets these consumers and seeks to send a message that its products are as good as the national brand products. It does so in part by using trade dress that is similar to the trade dress of the national brand equivalents.

I find that, while it unquestionably seeks to imitate Pfizer and to get a "free ride" at Pfizer's expense, Perrigo does not intend to deceive consumers or to confuse consumers into believing they are buying Pfizer's products when they are actually buying Perrigo's products. *See George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1541 (2d Cir.) ("There is an 'essential distinction ... between a deliberate attempt to deceive and a deliberate attempt to compete. Absent confusion, imitation of certain successful features in another's product is not unlawful and to that extent a "free ride" is permitted.' "), *cert. denied*, 506 U.S. 991, 113 S.Ct. 510, 121 L.Ed.2d 445 (1992). Rather, Perrigo uses private brand logos on its labels and its products are sold along side Pfizer's products. *Conopco, Inc.*, 46 F.3d at 1563–64. Moreover, on many of its products Perrigo uses a disclaimer that urges shoppers to "Compare to PLAX®." These actions show that Perrigo did not intend to deceive.

Moreover, the jury found in favor of Perrigo on the issue of intent to deceive. The jury was charged that, to find in favor of Pfizer on its trade dress claim, it had to find actual confusion or, as a proxy for actual confusion, intentional deception. The jury found against Pfizer in this respect. Hence, even if I were to disagree, I would be bound by the jury's verdict in this respect in any event.

While there are some who might find Perrigo's tactics unfair or unseemly, I find that it has not acted in bad faith for purposes of the Lanham Act. As the Second Circuit has held, "simulating the design of a competitor's successful products is not bad faith, unless there is reason to draw an inference of an intention to deceive." *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 383 (2d Cir.1997).

Similarly, the Federal Circuit has approved the use of tactics similar to those used by Perrigo:

> This is a case in which a retailer markets a national brand product and at the same time markets its own private label product in direct competition. The retailer packages its product in a manner to make it clear to the consumer that the product is similar to the national brand, and is intended for the same purposes. At the same time, the retailer clearly marks its product with its private logo, and expressly invites the consumer to compare its product with that of the national brand, by name.

> With the rise of regional and national discount retailers with established names and logos, retailers who market both national brands and their own private label brands in direct competition, this form of competition has become commonplace and well-known in the marketplace. When such packaging is clearly labelled and differentiated ... such competition [is not] presumptively unlawful.

*Conopco, Inc.*, 46 F.3d at 1565.

### (7) *Quality of Junior User's Product*

The seventh factor weighs slightly in favor of Pfizer. While there was no material evidence presented as to the quality of Perrigo's product as compared to Pfizer's product, clearly Perrigo did not work as hard as Pfizer to develop and manufacture quality products. Indeed, Perrigo's business plan was to mimic national brand products. It did not do its own research and did no efficacy testing to speak of. (Tr. at 1285–86). Its response when put on notice of the potential patent infringement issue was to substantially lower the amount of what Pfizer considered to be the new key ingredient—tetrasodium pyrophosphate. Under these circumstances, this factor must be considered to weigh in favor of Pfizer.

### (8) *Sophistication of Consumer Group*

Finally, the eighth factor weighs slightly in favor of Pfizer. As Perrigo acknowledges, one can expect a reasonably prudent consumer to conduct a less exacting inquiry when purchasing less expensive products. Here, the product in question is a low cost drug store or supermarket item. Hence, the level of consumer attentiveness is presumed to be low. *RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1061 (2d Cir.1979) ("products' modest cost was not conducive to the exercise of careful selectivity by purchasers"); *Shen Mfg. Co. v. Suncrest Mills, Inc.*, 673

F.Supp. 1199, 1205 (S.D.N.Y.1987). On the other hand, most consumers who purchase the types of products in question—personal care items—shop for these products often and they understand the differences between private label (or generic) products and national brand products. Hence, this factor, at best, weighs only slightly in favor of Pfizer.

### (9) *Weighing of Factors in Combination*

Some of the *Polaroid* factors thus favor Pfizer and some favor Perrigo. On balance, however, I conclude that Pfizer has not proven by a preponderance of the evidence that "an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Centaur Communications*, 830 F.2d at 1225 (quoting *Mushroom Makers, Inc.*, 580 F.2d at 47). In the end, while I am sympathetic to Pfizer's frustration at what it describes as being "stalked" by a competitor who seeks to deliver an equivalent product without going through the same expense, I simply am not convinced that an appreciable number of consumers who purchase personal care products such as toothpaste, mouthwash, and dental rinses for use on a daily basis are likely to be misled or confused into believing that they are buying Pfizer's Advanced Formula PLAX® when they are actually buying a Perrigo's Advanced Formula Anti–Plaque dental rinse under a private brand label. Accordingly, Pfizer's application for injunctive relief with respect to its trade dress claim is denied.

### CONCLUSION

The Clerk of the Court shall enter judgment as follows:

1. Declaring that defendants Perrigo Company and L. Perrigo Company infringed patent no. 5,338,538 under the "doctrine of equivalents";

2. Awarding plaintiff Pfizer, Inc. compensatory damages in the amount of $1,500,000, with pre-judgment interest, on the patent infringement claim under the "doctrine of equivalents";

3. Permanently prohibiting defendants Perrigo Company and L. Perrigo Company from again infringing patent no. 5,338,538;

4. Dismissing with prejudice plaintiff Pfizer, Inc.'s claims for "literal infringement" of patent no. 5,338,538; and

5. Dismissing with prejudice plaintiff Pfizer, Inc.'s claims for trade dress infringement.

As plaintiff prevailed in part and defendants prevailed in part, no costs are awarded.

SO ORDERED.